Number 181487, United States ex rel. James Banigan & Richard Templin, et al. v. Pharmerica, Inc. Mr. Harris? Oh, I'm sorry. I looked at the wrong... Ms. Harris. Bivins, Your Honor. Bivins, okay. Yes, sir. Good morning. My name is Zenobia Harris Bivins. I am speaking on behalf of the Opponents Relators. And I have my colleague, Michael Hurta, who I will reserve three minutes for rebuttal. Who's going to rebuttal? Mr. Michael Hurta, my colleague. Three minutes? Three minutes. Yes, thank you. May it please the Court. This is a False Claims Act case premised on a six-year kickback scheme between drug manufacturer Organon and numerous pharmacies under certain nursing homes across the country in violation of the anti-kickback statute, a dual criminal and civil statute. Specifically, Organon paid pharmacies, nursing home pharmacies like Pharmerica, kickbacks in the form of discounts and rebates to first increase the sales of their drug, Organon's drug Remeron, that had been underperforming in the market for quite some time. You're describing a single scheme here? Yes. A single six-year scheme. Two parts. Well, then, if you've got a single six-year scheme, doesn't that back you right into the prior disclosure problem and then bring us really to the pivotal issue is whether one of these fellows is an original source? So I think the original source issue is a very straightforward and easy question to answer. That it's clear that Mr. Banigan, Jim Banigan, is an original source. But I do not believe that we are backed up into public disclosure, particularly of the conversion aspect of the scheme because of this Court's decision in Cunningham in which the Court did a meticulous analysis and compared a lawsuit that was filed in California by the defendant in a California lawsuit with a suit that was filed in the First Circuit. So your brief used the formulation of two different schemes. Now you're using the formulation of one scheme but two aspects. I think that it's really just a nomenclature thing. And to clarify, because in our opening brief we used an original complaint and every subsequent complaint we used conversion scheme and switching scheme. But to use the nomenclature in the Cunningham case, it would be aspect one and aspect two. I would have preferred that if I had drafted the original complaint, but it's conversion scheme and switching scheme. Wasn't there continuity here? There was a kickback that was common to this whole thing. Yes, Your Honor. And both the Amerisource referred to both the, what is it, Remeron and Remeron-Soltap? Yes, but they were different uses. And what they talked about in both cases was trying to get more prescriptions for Oberon's products. Yes, Oberon's products. And the issue, though, is the conduct described in Amerisource is different specifically with respect to the conversion scheme. Sure, but in terms of the government being put on notice, they knew they were talking about kickbacks. They were talking about kickbacks to a particular company. They knew which company was making the kickbacks. They knew which drugs. Both were mentioned in both. So when you're told one, as you refer to, aspect of the scheme, aren't they necessarily, their investigation, going to uncover the full ramifications of the scheme in a way that would not have happened in Cunningham? Because in Cunningham, you've had two really different things. No, Your Honor, I don't agree with that. Because, for example, in Cunningham, you're dealing with urine tests, and they did different things with the urine tests. The two aspects that were really issued in Cunningham were billing multiple times for one urine test, and then a second aspect was taking multiple, having multiple urine tests enacted unnecessarily, that were medically unnecessary. So the commonality is, in Cunningham, you had urine tests that were used differently for different conduct. Here you have Rimeron and Rimeron-Soltab that were being used differently for different types of conduct. And going back to what I was saying earlier is the Amerisource case and also the switching scheme involved moving patients from a non-organon drug to Rimeron and possibly Rimeron-Soltab. And they did that for approximately two to three years in order to increase the amount of market share that Rimeron had. But in about 2000, in 2000 specifically, they realized that that part of the scheme was not going to work out because Rimeron was going to go generic. And so to maintain the profits that they had from the first part of the scheme, they devised a new way of maintaining their profits to protect against the patent expiration. Counsel, I was struck by your response to Judge Keada's statement when he suggested that perhaps the original source issue is the critical issue here. And you said that that's very straightforward. Yes, Your Honor. Since the word direct, which is part of the original source analysis, does not seem to be a straightforward word in terms of application, why do you think that is such an easy and clear issue? In this situation, particularly with Jim Banigan, he was a member of the leadership team that oversaw the department that created this larger scheme, both the switching part of it and the conversion part of it. But he was not directly involved in the fraudulent scheme. Isn't that correct? Right. He learned about it secondarily, one might say, when two individuals who were directly involved in it shared their knowledge of it and their concerns about it with him. Is that true factually? No, Your Honor, that's inaccurate. I'll point the court to these three record sites, JA-792, JA-895, and JA-951. And these three documents that were attached to the complaint are important because they show not only was Mr. Banigan present for the genesis of the scheme, he was on the email in which they announced, they sent an email out discussing the conversion scheme, part of the scheme, and he was also privy to discussions and asked for his advice about the contracts in which the scheme was implemented. So counsel, you cite those communications. Yes, Your Honor. Do you do that because if those communications, let's assume those communications do not mean what you say they mean. Let's assume that he first learns of the scheme through these conversations with the two individuals. Are you saying that then his knowledge of the information which led to the allegations, are you saying it would not meet the direct requirement if he only learns of it from those individuals? No, Your Honor, I would not concede that. Okay. Because if you accept for America's view of things, the only way that you can have direct knowledge is if you actually participated in the scheme. And that would actually be contrary to the language of the False Claims Act, which precludes people who are actually involved in the scheme and implementing it from receiving a False Claims Act award. So essentially, for America's view of things, would make an original source somebody who actually implemented the fraud. There would be no other way to have direct knowledge. And that, I think, would be problematic in terms of the False Claims Act language. And what about, I mean, he learns of the scheme, then nothing happens for about three or four years until Mr. Templin approaches him, and then he undertakes some investigation and uncovers some documents which confirm the scheme. I gather your position would be that acquiring that information in that way, that meets the standard of directness? Is that your position? No, Your Honor, we're not resting our argument completely on what he did in 2007 when he uncovered the documents or found the documents that basically substantiated what he already knew. We think that it's additional indicia that he's an original source. But we think he's an original source without those documents because a relayer doesn't actually have to have documents in order to go to the government with allegations of fraud.  So the documents in and of themselves are not the sole reason that we are arguing that he's an original source. To that end, the 2003 conversations that he had with Butch McKenna and John Maddox, the masterminds who actually developed and implemented the scheme, is not the sole reason that we say he's an original source. If the court looks to the AWP case and the Hutchison case that are both mentioned in the court's order, being privy to communications about the scheme, being in meetings about the scheme, being a close observer is sufficient. And so when we argued to the district court and presented our briefs was that as far back as 1999 when the scheme first began, he was in the department in meetings, was on email exchanges about the scheme. So that in and of itself is enough. And the fact that while the scheme was ongoing, the masterminds, both of them, within a day came back to him about their conduct while the scheme was ongoing is further indicia that he's an original source. And it's important to note that one of the arguments or one of the allegations we made in the complaint is that the reason he could not have access to the documents is because, for a matter of, that Organon instructed its employees to erase the documents from their computers and destroy paper copies. So the fact that a defendant was able to do that and now the district court is saying it was problematic that he didn't have the documents at the time, I think that's problematic in terms of whistleblowers because it encourages defendants to just destroy evidence and then they can say somebody's not an original source because they didn't have documents. Counsel, you argue, I believe, that if Mr. Brannigan is an original source, it follows that Mr. Templin is as well. The law does not support that proposition, does it? I don't think that the law clearly supports it, but I would encourage this court to say that if one relator is an original source with respect to a claim, then it really is, practically speaking, it doesn't matter if the others aren't an original source because we're talking about whether this court has jurisdiction over the United States claims. And so it really, practically speaking, doesn't matter if there's five relators and only one of them is an original source because the United States will still be able to go forward with its claims. And I think that the Booker decision, although it did not address this specifically, they spoke to it, the court spoke to it, but didn't go into it in detail because, practically speaking, it doesn't matter. If the court has jurisdiction, it has jurisdiction. Whether five relators are an original source or one relator is an original source, the United States still gets to go forward with its claim. So anyone in this country could have joined in as an original? That's, yes, absolutely. Well, it certainly matters in terms of being able to participate in the bounty that comes from a successful claim, does it not? I think that that is really, it deals with fee agreements because if the relators have a fee agreement, this court can start itself with that, you know, for obvious reasons. But if the United States makes a decision down the road that, actually the United States isn't even going to make that decision because the percentage that the relators get, it doesn't matter how many relators there are. So, for example, if there's $1,000 and the relator percentage is 30%, $300, it's the relator's decision as to how that gets split up. The United States has nothing to do with it. They get the same no matter how many relators there are. Thank you. Thank you. Mr. McGovern? Good morning. Good morning, Your Honors. May it please the Court, Benjamin McGovern on behalf of the Appellee for America, Inc. If Your Honors are aware from our briefs and as you've just heard, there's two questions for your consideration on this appeal. Substantial similarity and the question of whether Mr. Bannigan is a direct source of the allegations, or the facts underlying the allegations that he now brings. And unless the Court would like me to address them in a different order, I will address substantial similarity and then direct knowledge. With regard to substantial similarity, we actually think that is a very straightforward analysis because a side-by-side comparison of Amerisource and this litigation demonstrate that both have the same defendant in common, just for America, same causes of action, false claims act claims premised on kickback, same drugs, Remeron and Remeron-Soltav, both manufactured by Organon. And most critically of all, they both have the same alleged mechanism of fraud. There's one mechanism of fraud that pervades both Amerisource and this litigation. And that is that Pharmaerica entered into contracts with manufacturers, pursuant to which the manufacturer would pay Pharmaerica money in the form of discounts, rebates or something else. And in exchange, Pharmaerica would utilize its influence with nursing homes to increase the prescription and therefore the market share of certain drugs. And then those prescriptions would be submitted for reimbursement to Medicaid. Your Honors, we submit this is precisely what substantial similarity looks like. In fact, the relators recognize it too. We think it's notable that in page 9 of their reply brief, the relators write that there are no doubt similarities between Amerisource and the relator's case. The cases each involve the same defendant, certain facts overlap, and both allege violations of the false claims act and anti-kickback statute. Your Honors, this is dispositive because it's well-established that the public disclosure bar precludes actions that are even partly based upon previous disclosures. And there's a simple reason why. It's because Congress did not elect to add the adverb solely in front of the based-upon language. Now, with respect to the distinction that Relators Counsel is attempting to draw between conversion and switching, we suggest to your Honors, those aren't terms that appear in the complaint. They weren't terms that appeared in the briefing below. And what those terms actually are, they are contrivance, and they're attempting to invent a distinction that simply does not exist in this case. It's unclear to me what the relators are arguing here on appeal today. But certainly in their papers, they were persisting in the position that the conversion scheme, the latter of the two, did not disclose a scheme involving Remeron Soltap, and it's simply not accurate. All of the Amerisource complaints, and there were three of them, contained an allegation that Farmerica created something known as a select formulary, which is essentially a list of 20 or so drugs that would be eligible for these rebates and so-called kickbacks. Importantly, the two amended complaints actually attached physical copies of those formularies. Those appear in the record at page 1614 and 1974, and lo and behold, both of those formularies include the Remeron Soltap drug. So it's simply a mischaracterization of the record for the relators to suggest that Amerisource did not disclose a scheme involving Remeron Soltap. With regard to the related arguments regarding this court's decision in Cunningham, they're wrong that Cunningham saves them here. And the reason why is why I alluded to earlier. It's because when this court undertakes a substantial similarity analysis, really what it's looking for, sometimes the word aspect is used. I heard different elements of the same scheme today. Really what you're looking at is what is the mechanism of fraud. Another way to put it would be how is the government separated from its money. Here, as I said a moment ago, there was only one mechanism. Rebates were exchanged for increased prescriptions. Cunningham was fundamentally different, and it's something that we think, it's instructive that Winkleman, the latter decision of this court, pointed out explicitly. It said Cunningham turned on the entirely unremarkable proposition that allegations of fraud that are distinct from previous disclosures are not blocked. That's why Cunningham is different. Counsel, I wonder if I could, please go ahead, finish your answer. Cunningham relies on three mechanisms of fraud. Here we only have one, and I'm happy to answer. I just wonder if I could move you on to the original source question. Which seems to reduce the proposition of what does the word direct mean. It seems to me striking that in, I think it was 2010, that there were amendments to the False Claims Act with particular attention to the original source question, and the word direct falls out completely from the analysis, along with some commentary that can be found in the congressional record that Congress was frustrated with the courts for what Congress viewed as an unduly restrictive application of the word direct in a way that was really contrary to what Congress envisioned the purpose of the False Claims Act was. Shouldn't that history make us very wary of applying the very restrictive meaning of direct that you're urging us to do here? We basically have Congress telling us that the courts were getting it wrong, and if we continue to apply the law in that way, we'd still be getting it wrong despite what Congress has warned us about. Your Honor, that may be true in the case of a close call. We submit that this is not a close call. There again, we know from the complaint, he admits himself in paragraph 125 of his original complaint, he alleges he, quote, was not involved directly with the creation of the Medicaid scheme. Well, but that hardly gets you anywhere because he could have been centrally involved. How could he then be a relator? If he was centrally involved, Your Honor, I'm not sure I'd follow, Your Honor. Sure. If he was, suppose he was the mastermind of the scheme, could he be the relator? If he was the mastermind of the scheme, I think it's implicit in that that he would have direct knowledge, but he was not the mastermind. No, that wasn't my question. My question was, could he be the relator and recoverer at the 25 percent or whatever the bounty is? If he had direct knowledge, he would be the mastermind. If he were the mastermind. I'm not sure I'm understanding the distinction between the mastermind having direct knowledge. Well, I'm not surprised you're having that trouble because that seems to be your argument, is that only someone directly involved in perpetrating the fraud can be the direct source. Well, I think that's the, I mean, that is the statutory language, so you do need to be directly involved. Let me give you a simple example. Night Guard at the bank goes to the police station and says, I just overheard the two managers robbing the vault, and one of them confessed to me that they were doing it when I grilled him. Okay? It seems to me that Night Guard is the direct source of the report to the police. The Night Guard there, I would suggest, does have direct knowledge. He's a close observer of the fraud as it's ongoing, and it's organic to his job responsibility. That's something he's supposed to be looking out for. Well, all right, let's not have him the Night Guard then. He's a secretary who came in late one night, hears the two talking right after they finished robbing the vault, overhears them talking about the fact they just robbed the vault. She goes to the police. Is she a direct source? I think the happenstance there is the element that takes it out of the directness. I think you need to have... So you're saying she would not be a direct source under your analysis? That's correct. Okay. And there's cases out there... Then who would be a direct source? You have to actually have eyes on contemporaneously. Why would Congress have wanted to distinguish between someone who actually saw it and someone who, because of their job, was in a position inside the company to observe evidence of the fraud, to draw inferences from that, to garner a confession and to find documents that outsiders might not have been able to find? I think I can answer that question with reference to the facts in this case and kind of the way we've been thinking about it internally. It's not good enough. Banning seems to be suggesting that, hey, I'm in the building. That's close enough. You don't have to be in the building. You have to be in the room. Maybe you don't need to be the mastermind, but you need to be in the room. You need to be a close observer. What says that? Suppose you're not in the room at all, but as they exit the room, you overhear them talking about the fraud they've just finished perpetrating. Isn't that precisely the person that Congress wants to go running off to the authorities and say, let me tell you what I just found out? I would suggest, Your Honor, yes. That is a—well, strike that. The public disclosure bar in this case worked the way that it should. Mr. Bandy and Mr. Templin heard this information secondhand from a can of addicts, and they went and performed their investigation, and they uncovered allegations against Omnicare and Organon that were not publicly disclosed. Those claims survived. Those claims were settled. They got their bounty. Unfortunately for them, they ran into a situation where their investigation against Farmerica unveiled things that had already been previously disclosed. In that circumstance, there's not a disincentive that we need to be worried about. The incentive is still there to uncover fraud that is not publicly disclosed. The way you just couched that argument, it sounds like the public disclosure bar overrides the original exception. The original exception is—the original source is an exception to the public disclosure bar. That's correct, Your Honor. What I'm trying to understand is, and I think this just picks up on the point that Judge Kayano was making, it seems to me that Mr. Brannigan did exactly what Congress would have wanted someone to do in his position. He heard about a scheme that was troubling to him. He didn't do anything rash. He didn't act on it immediately. In fact, some years went by. Then he got some confirmation about it from another individual, Mr. Templin, and that encourages him to do some investigation where he uncovers documents that confirm what he's been told by McKenna and Maddox, and only then does he act. It seems to me that he's an example of an individual within a company doing exactly what Congress had in mind to expose these false claims practices. Why would we want to disqualify him as an original source under those circumstances? Because, Your Honor, I think it comes back to the fact that his information—he's being rewarded for something that he did not have direct knowledge of. I would have no problem with Maddox and McKenna before the Court of Relators in saying that they have direct knowledge of what was going on. Didn't he have direct knowledge of a confession or admission by one of the perpetrators? Yes, but I think that— Well, there you go. He had direct knowledge. I mean, I think this case— Didn't he have direct knowledge of where you would find certain documents in a company and what those were or what the prosecution had no idea about? After he had been told secondhand. I think this case is just like Amos and Cunningham, where this Court held that interviews and collateral research is insufficiently direct. I think this case is just like Saldivar, where hearing about the fraud from others was insufficiently direct for the 11th Circuit. I think this case is just like Shuman, where the 3rd Circuit held that discussions with colleagues were insufficiently direct. And I also think this case is just like Oliver, where the D.C. Circuit Court of Appeals held that knowledge learned from a third party that prompted an after-the-fact investigation was insufficiently direct. Is it true that Ms. Harris-Giddens said that a perpetrator cannot share in the bounty? A perpetrator cannot share in the bounty. I'm not certain, Your Honor. Would you agree that if that were true, then we would certainly have to insist that the definition of original source not be so narrow as if it essentially only included perpetrators? I don't think that I'm suggesting that the term direct knowledge is limited to perpetrators. It can be the perpetrator. It can be the mastermind like McKenna and Maddox. But it also could have been someone like the twinned folks that were part of their special and discrete team, as Bandyan described. Who were involved in the fraud? Who were involved. Well, they might not have been involved, but they may have been observing it as it was going on. Okay. Well, didn't he observe the email? Not while it was going on. That email does not disclose anything about Farmerica. Those three exhibits that are now pointed by the related people. Well, no, but it starts, as often is the case in any good mystery movie, the first piece of information that leads you to somewhere. It may not show the whole thing, but it certainly starts the inquiry, and those are the people that we would like to do the inquiry because they were the only people in position to do it inside the company. Well, the burden is on Mr. Bandyan to prove that he's an original source, and here all he has come forward with is three emails, or three exhibits rather, and he says, look at those exhibits. They prove that I have direct knowledge. But what's missing from those exhibits? There's no mention of Farmerica. There's no mention of therapeutic interchange. There's no mention of a submission of false claims to the government. Bandyan could have come in in the lower court with an affidavit to supplement what else was going on, but he didn't do that. He chose to do that. He needs to live with it. So he's stuck with those exhibits, and those exhibits do not tell him. They do not confront him with direct knowledge of fraud. Well, they cite those, but I think your opposing counsel made clear they don't rely exclusively on those emails. It's the totality of his knowledge and the way in which he gained it that they rely upon, the emails, the conversations with McKenna and Maddox, and then the subsequent investigation. It's all of that together, I think they're arguing, that gives him direct knowledge within the meaning of the original source requirement. Those line of two things are both examples of ways that he gained knowledge secondhand. I don't think you can retroactively confer direct knowledge by after-the-fact conversations with folks and after-the-fact investigation like Mr. Bandyan performed in 2007. What do you mean by after-the-fact? You mean because the scheme was already over? Yes. In fact, he did not have direct knowledge of what was going on. Why would it matter that the scheme had ended? I mean, why would that make it any less consequential to the government that the scheme was no longer paying out? Because the more time that goes on, the less likely that you're a close observer with direct knowledge. In fact, in this case, as much as Mr. Bandyan wants to point to these emails in 2000, they were so troubling to him, he did nothing for six years, did nothing to investigate for six years. And I see that my time is up. I'll rest on my brace with the remainder of the arguments. Thank you. Mr. Hurta, good morning. Good morning, and may it please the Court. My name is Michael Hurta, and I'm going to finish up our rebuttal. I'd like to start with a clarification for the Court. Just as to the issue of perpetrators not being relators, it's not a hard-line rule, but the statute does say that the government can refuse an award to perpetrators. And if the Court would like, we can submit a letter afterwards with the statutory language on it in pointing that out. But after that, I would like to just kind of start out with distinguishing the two cases. The two cases that America truly relies on here are two out-of-circuit cases that are actually distinguishable from this one in Salvador. And the issue with those cases, for example, in Salvador, is Salvador, the relator, actually does get secondhand information. He wasn't even working in the same department where the fraud was occurring. And the Court in Salvador says he relied on his managers that are in a different department than the fraud was occurring, and that's simply not enough. That is truly secondhand. As opposed to, in our case, we think we could rely on this circuit's precedent. This circuit in Hutchison, although it very quickly dealt with the original source issue, it said in footnote 8 in Hutchison, that it was clear that Ms. Hutchison was an original source. And Ms. Hutchison bears the same trademarks as the district court in Hutchison discussed in detail that Mr. Banigan does here. Because of her position in the company, she was privy to e-mails. She was privy to conversations. And she was privy to much of the fraud occurring. What do you say to the argument we just heard on waiver that you limited in the pleading and argument below your reliance on the original source point to possession of the documents? I would respond to that because this is a jurisdictional issue. And as the Supreme Court has stated in Rockwell, this Court has to decide for itself what its jurisdiction is. Even if, as was the case in Rockwell, the argument was not even just waiver but concession. That runs the other direction. I don't think that's going to help you. All right. If there's no jurisdiction, you can't waive it. But the question is, did you raise below the original source argument that is capturing our attention today that the person's whole involvement as an insider in the company, the e-mails, the hearing of the conversation, the documents collectively make that person an original source? Yes, Your Honor. We may not have in our briefing itself pointed to each exhibit in the way that we do in our briefing before this Court. But we argued before the district court that – may I finish my answer? Please. We argued in the district court that Mr. Banigan was privy to communications and that he was, because of that reason, privy to communications and internal e-mails and documents, an original source. And we had the documents cited to in the complaint. And we think that's enough to discuss the issue, even if you consider that issue. And for these reasons, we ask the Court to reverse and remand, and we rest on our creeps.